---

### Fleet *vs.* Hegeman and others.

*Oysters* planted by an individual in a bed, clearly designated and marked out in a bay or arm of the sea, which is a common fishery to all the inhabitants of the town in which the bay is situated, are the property of him who planted them, and for any interference with them by another, *trespass* lies.
*It seems,* that if a bed thus planted, interfered with the exercise of the common right of fishing, or if the oysters were undistinguished from others in the public waters, the interest of the owner in them would be subservient to the enjoyment of the public use.

Error from the Queens common pleas. Fleet sued Hegeman and two others in an action of *trespass* in a justice's court for taking and carrying away 2000 oysters, the goods and chattels of the plaintiff. The defendants pleaded the general issue. The cause was tried by a jury, and a verdict found for the defendants, on which the justice rendered judgment.

The plaintiff sued out a certiorari, returnable in the common pleas of Queens ; which court *affirmed* the judgment of the justice. Whereupon the plaintiff removed the record into this court by writ of error. From the return of the justice, it appeared that the plaintiff had an oyster bed in *Oyster Bay*, in Queens county, of the extent of about 4 or 5 square rods, enclosed with stakes, at the distance of about 15 rods from the shore, opposite land owned by him or by his father. About two years before the trial, which took place in November, 1833, the plaintiff put into this enclosure a quantity of very small oysters, picked up around the shores ; and shortly previous to the trial, the defendants went into the bed enclosed by the plaintiff and raked up and took 600 or 700 oysters, worth from ten to eleven dollars. Five or six years previous to the trial, oysters were plenty in the bay ; but since then, they were not to be found, except where they were *planted.*

*D. Rogers & C. Bogert,* for the plaintiff in error, insisted that the plaintiff had acquired a separate property in the oysters in question, by separating them from the common mass of things and reducing them to possession, designating his ownership by the stakes enclosing his bed. 2 *Black. Comm.* 9. In *England,* by statute 48 *Geo.* 3, *ch.* 144, 3 *Chitty's Cr. Law,* 930, which is in affirmance of the common law, any one knowingly and wilfully stealing oysters from beds *marked out as such,* is deemed guilty of felony ; and in *Connecticut* no person may take oysters, &c. from their beds in front of another's land. 1 *Swift's Syst.* 343. *See also Angell on Tide-waters,* 158, 159, 120, *n. a.* The plaintiff, in planting the oysters, exercised a right depending on the same principle as that of drawing water from a public well, or occupying a fishing place or an anchorage. *Vattel,* 175. *Angell on Tide-waters,* 158, 159. If the plaintiff interfered with the rights of others, they should have proceeded against him by *purpresture, Angell,* 133, and not have seized and carried off his property.

*S. A. Foot,* for the defendants in error. The question to be determined is, whether oysters planted in tide-waters are private property. In *Rogers* v. *Jones,* 1 *Wend.* 237, *Gould* v.

*James*, 6 *Cowen*, 369, *Hooper* v. *Cummings*, 20 *Johns. R.* 90, and *The People* v. *Platt*, 17 *id.* 195, this court have settled the principles in regard to fisheries, and the rights of persons relative to them, who own property adjacent to navigable waters of the first and second class; and nothing is more certain, than that a man whose farm bounds on the ocean, or an arm of the sea where the tide ebbs and flows, has no exclusive right below high water mark, and can acquire none except by grant from the state. Shell fisheries are subject to the same rules as other fisheries, and to take shell fish, any one may dig the earth between high and low water mark. 2 *Bos. & Pul.* 472. *Dougl.* 441, 445. *Comyn's Dig.* 107. In *Ferguson* v. *Miller*, 1 *Cowen*, 243, and in *Gillett* v. *Mason*, 7 *Johns. R.* 16, this court held that *wild bees*, being *feræ naturæ*, could not be reclaimed so as to give the finder a title to them by any thing short of actual possession—that marking the tree with the initials of the name of the finder, and that too with the consent of the owner of the land on which the tree stood, was not such a reclamation as to give property in them to the finder. The principle established by these decisions is decisive of this case. Besides, the returning of the oysters to their natural element must be deemed an abandonment of them, and removes all pretence of right to them. *Angell on Tide-waters,* 24. The placing of stakes around them was not as decisive an act of appropriation as marking the bee trees.

*In reply*, it was urged that the placing of the oysters in the water after picking them up on the shores, instead of an abandonment, was an appropriation. The true test of an abandonment is the manifestation of the intention of the owner: did he intend to abandon? for property acquired by occupancy remains in the finder till he shows an intention to abandon it. 2 *Black. Comm.* 9. The contrary intention is here manifest.

*By the Court*, NELSON, J. It has before been decided that the right of fishing in this harbor or bay, belonged exclusively to the inhabitants of the town of Oyster Bay, derived by grant from

the crown of England. *Rogers* v. *Jones*, 1 *Wendell*, 237. In that case, Rogers was sued for a penalty created by a by-law of the town, declaring that " no person, not being an in-habitant of Oyster Bay, shall be allowed to rake or take any oysters in the creeks or harbors of the town, under the pen-alty of $12,50 for each offence." He had entered the har-bor or bay, and caught and carried away a quantity of oys-ters, about 100 yards from the beach; was a citizen of New-York, but not an inhabitant of the town. The defence was put upon the ground, that the bay, being an arm of the sea where the tide ebbed and flowed, was a common fishery for all the citizens of the state, and that the inhabitants of the town possessed no exclusive right. The court decided that the grant to them by Sir Ed. Andross, under Charles II. in-vested them with that right, and sustained the by-law under which the penalty was inflicted. *See also* 6 *Cowen*, 376.

Both parties in this case probably are inhabitants of the town, and therefore are entitled to the common right of fish-ing in the bay. At all events, no question of the kind is raised in the case, and we assume such right belonged to the defendants. The plaintiff had gathered the oysters when small, some two years before the trial, and planted them in a bed in the bay, about 15 rods from the shore; none grew there at the time, nor have any grown since out-side of the bed. That a qualified property in the oysters was acquired by the plaintiff is admitted; but it is conten-ded that the planting them in the bay, where a common right of taking them existed, was an abandonment of them to the public use. If so, it must be by force of law; for the case fully discloses that no such intent in point of fact existed. On the contrary, they were deposited there by the owner, to improve or rather give value to them, and with reference to an ulterior use. As to all inanimate things, an absolute property in possession may be acquired in them—such as goods, plate, money; and if the article in question could be considered as falling within that descrip-tion, there could be no doubt the defence taken would be untenable, unless there was an abandonment in fact. Oys-ters have not the power of locomotion any more than inani-mate things, and when property has once been acquired in

UTICA,
July, 1835.

Fleet
v.
Hegeman.

them, no good reason is perceived why it should not be governed by the rules of law applicable to inanimate things. But, it is contended, they fall within the rules of law applicable to animals denominated *feræ naturæ*, the same as deer in the forest, pidgeons in the air, or fish in public waters or the ocean. A qualified property is acquired in these by reclaiming and taming them ; or by so confining them, within the immediate power of the owner, as to prevent their escape, and the use of their natural liberty. Deer in a park, hares or rabbits in a warren, or fish in private ponds or trunks, are instances of this description. These, it is said, are the property of a man no longer than while they continue in his keeping or possession. Manucapture is not necessary to acquire, much less to continue possession of this property. 3 *Caines,* 178. If a deer or any wild animal reclaimed hath a collar or other mark put upon him, and goes and returns at pleasure, it is not lawful for any one else to take him ; though if he be long absent, without returning, it is otherwise. In all these cases of wild animals reclaimed, the property is not absolute, but defeasible, by the animals resuming their ancient wildness, and going at large—as if the deer escape from the park, or the fishes from the pond or trunk, and are found at large in their proper element, they become *feræ naturæ* again, and are free to the first occupant that may seize them. But while they continue the owner's qualified property, they are under the protection of the law, as much so as if they were absolutely and indefeasibly his ; and an action will lie for any injury committed. 2 *Black. Comm.* 395, 6, 7. 3 *Co Litt.* 294, *note c.* 7 *Co.* 86, *case of the Swans.* 8 *Vin. tit. Property, B.*

It is clear, from the principles and cases above mentioned, that the right to appropriate property of the description in question does not depend exclusively upon the place where they are found, but upon the fact that they are *feræ naturæ* unreclaimed ; for though the deer should be found browsing in his own forest, and the pidgeon flying in the air, or any of the class reclaimable, at large, if they have been in fact domesticated and possess the *animus revertendi,* they are not common property, and the occupant who takes them gets no title; and if he takes them, knowing their condition, he be-

comes a trespasser. This is clear upon well settled authority. The right of the plaintiff to the oysters is within the reason of these principles. They have been reclaimed, and are as entirely within his possession and control as his swans, or other water fowl, that may float habitually in the bay. They were distinctly designated according to usage; and, besides, the defendants had actual information of the ownership, and they can set up no greater right to take them, because found in their native element, than tame pigeons in the air, or a domesticated deer upon the mountain. If the bed interfered with the exercise of the common right of fishing, or if the oysters were undistinguished among others belonging to the public waters, the interest of the owners in them would undoubtedly be subservient to the enjoyment of the public use. But the exercise of that right in this case was a mere pretence. No oysters of the natural growth of the bay, fit for use, had been found there for years. The bed interfered with no other sort of fishing, for either profit or pleasure. The case presents a deliberate and wanton violation of property acquired by the industry and care of another, under the pretext of exercising a *right in common* which the defendants knew to be fruitless. We certainly would have regretted if the law had given countenance to such depredations, and we are rejoiced to find they are as gross a violation of the law as they are of the first principles of justice.

Judgment reversed.